**BATH IRON WORKS CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 90–897C, 90–898C.**

United States Court of Federal Claims [1].

Nov. 12, 1992.

**1.** On October 29, 1992, the President signed S. 1569, a Bill implementing the recommendations of the Federal Courts Study Committee. In section 902 therein, the United States Claims Court was redesignated as the United States Court of Federal Claims (hereinafter "COFC"). P.L. No. 102–572.

Robert H. Koehler, Washington, D.C., attorney of record, for plaintiff.

Shalom Brilliant, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

*Introduction*

Plaintiff filed claims in this court on September 7, 1990, appealing the contracting officer's decisions denying its requests for price adjustments on two Navy shipbuilding contracts. Defendant moved to dismiss the complaints for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim because plaintiff failed to satisfy the time limitations out-

lined in 10 U.S.C. § 2405 for commencing an adjustment claim with the contracting officer. A thorough analysis of the facts and the statute at issue compels this court to hold that plaintiff's failure to satisfy the 18–month time limitation of § 2405 at the administrative level (*i.e.*, before the Secretary) *is not a jurisdictional bar to suit in this court.* Further, we also hold that said 18–month requirement is not a statute of limitations which plaintiff has failed to fulfill as a condition for proceeding in this court. Accordingly, we are constrained to deny defendant's motion to dismiss.

*Facts*

Pursuant to the Navy's AEGIS Cruiser Program (the "Cruiser Program"), several shipbuilding contracts for construction of TICONDEROGA Class Cruisers were awarded to Bath Iron Works ("BIW"), the "plaintiff," a Maine corporation with its principal place of business in Bath, Maine. Two of these contracts are the subject of claims relevant to this opinion. The first contract, N00024–84–C–2005 (the "CG 58 contract") for the construction of the PHILIPPINE SEA, was awarded by the Navy (*i.e.*, the "defendant") to BIW as Follow Yard[2] on December 27, 1983. The Navy awarded the second contract, N00024–85–C–2036 (*i.e.*, the "CG 60 contract"), to BIW, again as Follow Yard, on November 26, 1984. Unlike the CG 58 contract, which encompassed the construc-

tion of only one cruiser, the CG 60 contract called for the construction of two cruisers, the NORMANDY and the MONTEREY. In addition, the CG 60 contract contained options for construction of two additional cruisers, *i.e.*, the COWPENS and the GETTYSBURG.

According to the terms of both contracts, any change in the Lead Ship configuration baseline was to be initiated through an Engineering Change Proposal ("ECP") process which is governed by the Configuration Control Clause within the contracts. Specifically, BIW, Ingalls, and the Navy operated this change process through the following methodology, which was utilized from the outset of the Cruiser Program until August of 1986:

1. The ECP involved the—"preparation and submission to the Navy for approval/disapproval of the design change proposal and its supporting documentation ...,"[3]

2. subsequent "approval of the ECP by the Change Control Board ["CCB"], the reviewing authority for the Navy,"

3. and, finally, following approval of the ECP by the CCB, "the issuance by [Ingalls] of detailed drawing changes" which is referred to as an Engineering Change Notice ("ECN")[4] and which reflects "the full scope of the approved ECP."

2. For the Cruiser Program at issue, Ingalls Shipbuilding, Inc. ("Ingalls") was the Lead Yard and BIW the Follow Yard. The Lead Ship of the Cruiser Program is designed and constructed by the Lead Yard. Additional cruisers are then constructed by both the Lead Yard and the Follow Yard. Under this particular program, Ingalls possessed responsibility for preparation of the "configuration baseline design" (which encompasses the functional and physical characteristics of the Lead Ship, as represented by the contract specifications, contract drawings, and other documents such as Government standards) and the "detail design" for the Lead Ship. This responsibility included the development of drawings and other technical documentation in conformity with the outlined specifications. Subsequently, pursuant to this process, the configuration baseline and detail design are provided by Ingalls to BIW, as Government–Furnished Information ("GFI"), in order to allow the Follow Yard to construct the cruisers to the same

class configuration. In addition, the drawings are warranted to BIW by the Navy pursuant to the "Documentation Acquired by the Contractor" clause of each contract.

3. For step 1 of this process, the ECP would originate from either BIW, Ingalls, or the Navy. Irrespective of which party originated the ECP, both BIW and Ingalls were required to prepare and submit an ECP and supporting documentation to the Navy.

4. The ECNs, generated by Ingalls, are documents that describe with specificity, by a detailed design *drawing*, the design prior to the ECP and the new design with a corresponding bill of materials. For example, and as noted by plaintiff, "if the work scope of an ECP caused a change in the configuration of ten different drawings, then [Ingalls] would prepare and issue an ECN for each drawing...." Complaint (hereinafter "Cmplt"), p. 6.

With respect to the essential issues in this case, plaintiff avers that the Navy, through Ingalls, would provide BIW with an ECP originally proposed by Ingalls. According to plaintiff, the ECP would contain a description of the existing design being proposed for change, a description of the proposed change, and the "Scope of Work" to accomplish said change. In addition, the ECP would contain a list of necessary materials and equipment to be added and/or deleted to accomplish the augmentation.

Based only upon this ECP supplied to BIW by the Navy, BIW would be required to develop a price proposal for the ECP, which would subsequently be submitted to the Navy's Supervisor of Shipbuilding located in Bath, Maine ("SUPSHIP Bath"), for review and price negotiations. Following price negotiations and price agreement between BIW and SUPSHIP Bath, both the ECP and agreed price proposal would be offered for approval to the Navy's CCB.

If and when the CCB accepted such proposal, Ingalls would commence the actual operation of incorporating the endorsed contract alternatives into the ship's design, and the contracting officer would begin activities to formally integrate the ECP into the contract through a contract modification agreement.

In light of this background, plaintiff avers that around May 1985, it first ascertained that there were many instances where there were a myriad of *additional* drawings being influenced by approved ECPs which had not been earmarked for alteration in the *original* ECP. Accordingly, BIW notes that these additional drawings were not included in its estimated price to defendant for performance of the ECP. In view of these variances, in June 1985, BIW's engineers randomly sampled 53 ECPs which were previously generated by Ingalls and approved by the Navy. As a consequence of this process, BIW opines that it had ascertained that Ingalls identified 547 drawings in the original ECPs which needed to be changed through "implementation of the ECPs." Cmplt, pp. 7–8. BIW avers, however, that in actuality

"a total of 740 drawings were [generated] ... by those [original] ECPs." Cmplt, p. 8.

As a result of the numbers discovered by this sampling, BIW notified SUPSHIP Bath on June 10 and 17, 1985, that it suspected "ECP Work Scopes were increasing between the time BIW priced the original ECP ... and when the approved ECP was transmitted to BIW as an ECN, thereby causing BIW to incur higher costs than anticipated by the parties." Cmplt, p. 8.

Seven months later, in January 1986, BIW approached defendant with a Rough Order of Magnitude ("ROM"), which essentially is an "estimate of the added cost of additional, changed and late ECNs." Cmplt, p. 8. As of this date, BIW estimated that these alterations had led to "an additional 27,376 engineering manhours in performance of the CG 58 Contract." *Id.* Plaintiff then states that as a result of this revelation, BIW, Ingalls, and the Navy acknowledged that severe imperfections pervaded the ECP process. In response thereto, plaintiff avers that the Navy issued, on August 11, 1986, a new procedure to address the problem of increased work scopes caused by the additional ECNs and drawings. The revised procedure, as averred by plaintiff, was as follows:

—All ECPs would first be screened by an Initial Review Board ("IRB");

—If changes were approved by the IRB, and if all drawings were in place, said changes would then be transferred to Ingalls for preparation of the Ship Impact Summary ("SIS") and a ROM estimate for the proposed engineering change;

—BIW, the Follow Yard, would also be asked to prepare a ROM estimate from the SIS;

—Subsequent to the completion of this compilation, the final ECP, including drawings in the form of ECNs, would be negotiated and submitted *as final* by the Navy to BIW for implementation;

—Any final action and ECP pricing would not occur until the entire compilation of revisions were submitted and approved by the CCB.

Through this modified procedure, if BIW ascertained during ECN implementation that drawing revisions were incorrect or that additional work was required, a "Corrective ECP" would be issued by the Navy through Ingalls to compensate BIW for the added work." Cmplt, p. 9.

Following introduction of the foregoing new Navy procedures, on November 3, 1986, BIW submitted a single Request for Equitable Adjustment ("REA"). This REA submission sought an *overall* increase in contract prices for the Cruiser Program resulting from various actions and inactions by the Navy which affected BIW's performance.[5]

On May 18, 1987, following extensive negotiations between BIW and the Navy, BIW submitted a revised REA. According to plaintiff, this revised REA identified with specificity the "late and additional ECN issue." For example, Line Item 15 of the REA, referred to as "REA 15," was entitled "Incomplete ECP/ECN Work Scope" and encompassed a claim for "financial harm caused by Class I ECNs being received either late to the schedule cited by the respective ECP or in addition to those contemplated by the ECP." In total, the revised REA estimated the costs of the late and additional ECNs as $4,166,000 for CG 58 and $1,167,000 for CG 60. Complt, p. 10.

From May 18, 1987, through September 1987, BIW and the Navy conducted settlement negotiations pursuant to the REA. However, with respect to CG 58 and CG 60, the parties agreed to exclude REA 15 from the overall settlements, with an understanding that REA 15 would be resolved

"in the normal course of business."[6] Plaintiff also asserts that these modifications which formally altered the contract, and which addressed but did not price REA 15, nevertheless obligated plaintiff to perform the expanded scope of work.[7]

Following the settlement of September 15, 1987, BIW and the Navy commenced negotiations on REA 15. Pursuant to these discussions, plaintiff proffers that the parties agreed in principle to a methodology to resolve the issue. Specifically, plaintiff avers that the parties would require "BIW to randomly sample the number of drawings on BIW's Cruiser Contracts impacted by late ECNs outside the scope of the original ECPs in order to quantify the cost of the impact on Contract performance."[8] Cmplt, p. 12.

In light of this developed methodology, plaintiff submitted a revised REA 15 on February 17, 1988, for extra costs based upon late and additional ECNs and drawing revisions. Specifically, BIW listed extra costs of $4,414,634 for CG 58 and $1,182,358 for CG 60, to which defendant responded by performing a Technical Assessment Review ("TAR") for each individual item of plaintiff's claimed growth. Defendant then forwarded specific TAR comments to plaintiff. Plaintiff asserts that other than these TAR comments, defendant failed to dispute that "BIW's contract performance costs were increased as a result of late, changed and additional ECNs and drawings which increased the work scopes of previously adjudicated ECPs." Following receipt of the TAR comments, BIW submitted to the appropriate contracting officer its final re-

5. According to plaintiff, on December 15, 1986, William E. Graham, Vice President, Contracts, for BIW, certified the REA "in accordance with *the requirements of the 1979 Department of Defense Appropriation Authorization Act, P.L. 95–485 (DFARS 33.7000) and the Contract Disputes Act of 1978 ["CDA"], P.L. No. 95–563."* Cmplt, p. 10.

6. With respect to the agreement to exclude REA 15, plaintiff states that Modification P00004 to CG 58 and Modification P00005 to CG 60, both dated September 25, 1987, contain a release clause and additional language expressly severing and reserving the REA 15 issue for "the

normal course of business," which plaintiff interprets as REA 15 not being considered a claim. Cmplt, pp. 11–12.

7. As of the date of the complaint, September 7, 1990, plaintiff claims the government has yet to issue a unilateral price determination for the REA 15 work.

8. According to BIW, pursuant to this process, the Navy selected ECPs through a sampling process during 1987. Subsequently, BIW would reprice the ECPs to ascertain whether there had been an increase in the scope of work, as priced by BIW in its original estimate.

vised claim on November 13, 1989, which was certified by D.D. Fitzgerald, BIW's President and Chief Operating Officer. Pursuant to this revised claim, BIW requested $4,052,769 for the CG 58 contract (docket no. 90–898) and $1,523,230 for the CG 60 contract (docket no. 90–897).

On July 20, 1990, slightly more than eight months following the submission of BIW's revised claim pursuant to REA 15, the contracting officer at SUPSHIP Bath denied its claim "in its entirety." Contracting Officer's Decision ("COD") at 1. In his factual description, the contracting officer noted the following: First, he stated that the May 17, 1987 letter in which BIW presented Line Item 15 to the Navy contained "no certification, documentation or supporting data ... other than a sentence describing the item and the requested amounts ..." COD at 1–2. The contracting officer also concluded that the certification for the REA submitted on September 25, 1987, was not valid for Line Item 15. *Id.*

Secondly, the contracting officer noted that it was not agreed upon by the parties that sampling would be used to establish entitlement for the REA. Rather, the contracting officer stated that prior to February 17, 1988, the date on which William E. Graham, Vice President of Contracts, certified REAs for Line Item 15, SUPSHIP Bath and BIW only "informally agreed that sampling could provide a basis for estimating the costs (or quantum) associated with Line Item [15]." COD at 2.

Based on the foregoing, and the specific factual findings, the contracting officer held that:

In Line Item #15, as submitted, BIW has not demonstrated entitlement to the requested price adjustments in that BIW has failed to establish that there was an increase in the number of Class I ECNs/drawings over the number BIW reasonably expected it would receive when it estimated and negotiated the price of the ECPs to be incorporated into the contract(s). BIW also failed to demonstrate that the amounts claimed were actually incurred by BIW or that such amounts resulted from any increased

numbers of ECNs/drawings to the affected ECPs.

The contracting officer's decision also specifically noted, *inter alia,* that 10 U.S.C. § 2405, discussed in more detail *infra*—

... prohibits the Secretary of the Navy from adjusting any price under a shipbuilding contract entered into after 7 December 1983 for an amount set forth in a "claim, request for equitable adjustment occurring more than 18 months before the submission of the claim, request, or demand." The statute states that a claim, request or demand is not considered to have been submitted unless it contains the certification required by the Contract Disputes Act and supporting data.

By letter dated 9 September 1988, SUPSHIP advised BIW that, with regard to Line Item # 15, an event for the purpose of calculating the 18 months under 10 U.S.C. § 2405 was the receipt of ECNs/drawings in excess of the number used to price the affected ECP. BIW was further advised that equitable adjustments for Line Item # 15 were "time-barred" regarding events occurring more than 18 months prior to BIW's submission on 17 February 1988....

\*     \*     \*     \*     \*     \*

... [P]ursuant to 10 U.S.C. § 2405, price adjustments for events which occurred prior to *14 May 1988* (the date 18 months prior to the 13 November 1989 certification) are barred. Accordingly, price adjustments pursuant to Line Item # 15, which are based on BIW's receipt of excess ECNs/drawings, are barred because all the alleged excess ECNs/drawings were received by BIW *prior* to 14 May 1988.

COD at 3–4 (emphasis added).

In response to the contracting officer's July 20, 1990 decision denying relief under both CG 58 and CG 60, BIW filed a timely appeal in this court on September 7, 1990. In summary, plaintiff's complaints allege that:

29. As part of its obligations under the Contract, the Navy was to furnish BIW accurate and complete GFI with

which to price Lead Yard ECPs. Once an ECP was approved, the Navy was obligated to timely provide BIW with accurate and complete ECNs resulting from the approved ECP. In practice, a significant number of the ECPs received by BIW, and upon which BIW based its price to the Navy for implementation, were incomplete and subject to supplementation by additional drawing revisions following BIW's price of the original ECPs. Further, late and additional ECNs and drawing revisions were added to the scope of the ECPs to be implemented by BIW, thereby increasing the cost of performance to BIW. These increases in work are changes under the "CHANGES" clause of the Contract for which BIW is entitled to be compensated. Cmplt, pp. 13–14.

Accordingly, plaintiff's complaints pray that this court award BIW $4,052,769.00 plus interest under CG 58 and $1,523,230.00 under CG 60, both pursuant to the Contract Disputes Act of 1978 [9] ("CDA"), "to compensate [BIW] for its performance under the Contract." *Id.* at 14.

In opposition thereto, on June 21, 1991, rather than an answer, defendant filed a motion to dismiss plaintiff's complaints for lack of subject matter jurisdiction, or alternatively, because plaintiff's complaints fail to state a claim upon which relief can be granted. Plaintiff subsequently filed an opposition thereto on July 19, 1991, to which defendant's reply was filed on August 2, 1991.

*Contentions of the Parties*

1. *Defendant*

Pursuant to RUSCC 12(b), defendant moved to dismiss plaintiff's complaints, and in support of its position, proffers three pointed arguments. First, defendant contends that one obstacle is imposed by section 10(a)(1) of the Contract Disputes Act, 41 U.S.C. § 609(a)(1), which is a prerequisite to this court's jurisdiction, requiring the submission of a properly certified claim to the contracting officer. The second critical obstacle is 10 U.S.C. § 2405 (1984),

which defendant avers is an impediment to the COFC's subject matter jurisdiction involving claims for adjustments to shipbuilding contracts barred by the 18–month statutory time limitation. Defendant contends that, when read together with the CDA, "section 2405 operates as a jurisdictional bar." Defendant's Motion To Dismiss ("DMD") at 9–10.

The third contention averred by the defendant is that even if 10 U.S.C. § 2405 were not a jurisdictional prohibition, noncompliance therewith would, nevertheless, constitute a failure to state a claim (*i.e.*, a statutory limitation) upon which relief can be granted if such claim arose out of events occurring *more* than 18 months before the submission of a claim. Defendant avers that the "events of which BIW complains, and out of which the claims at issue arose, consisted of BIW's receipt of more ECNs than were contemplated by the ECPs upon which pricing was based, receipt of ECNs involving a greater scope of work than in the applicable ECPs, late receipt of ECNs, and BIW's supplementation of certain ECPs by additional drawing revisions following the pricing of the ECPs." DMD at 14. In short, defendant observes that for the Court of Federal Claims "to entertain claims which section 2405 prohibits the military departments from entertaining, would entirely defeat the purpose of [10 U.S.C. § 2405 (1984) ] as well as that of the CDA," as manifested in the legislative history. DMD at 13.

In summary, defendant avers that there exists "no basis for dating the 'events' from which BIW's claims arose, for purposes of 10 U.S.C. § 2405, as anything later than the dates when BIW *received* the ECNs in question, or—where BIW claims to have revised drawings because of incomplete ECPs rather than pursuant to an ECN—the dates when those drawings were revised." DMD at 25 (emphasis added).

2. *Plaintiff*

Plaintiff's opposition to defendant's motion to dismiss, filed on July 19, 1991, also proffered three arguments. Its first con-

---

**9.** Pub.L. No. 95–563, 92 Stat. 2383 (1978), *codi-*    *fied at* 41 U.S.C. § 601–613 (1982).

tention is that 10 U.S.C. § 2405 is neither a jurisdictional limitation on the COFC's ability to hear or decide a claim nor does it act as a statute of limitations. Rather, contends plaintiff, 10 U.S.C. § 2405 is simply a restriction *only* on the "Secretary of a military department's ability to spend appropriated funds ... and [n]othing in the statute, its legislative history, or prior Congressional practice suggests that it was intended to alter this Court's Tucker Act jurisdiction to hear BIW's contract claim." In support of its position, plaintiff observes that defendant is merely attempting to "bootstrap its jurisdictional argument by positing that compliance with 10 U.S.C. § 2405 is a condition precedent to submission of a claim under the [CDA] ... [when in actuality] § 2405 does not amend the [CDA] and, *in the absence of a contract clause in its contracts to implement the statute*, BIW has a contractual right to an equitable adjustment in the amount claimed." Plaintiff's Opposition ("PO") at 15. In addition, plaintiff contends that 10 U.S.C. § 2405 is clearly not a statute of limitations, operating on the COFC, because of its conspicuous failure to even mention the court, the Tucker Act, or the CDA. What it does, plaintiff avers, is merely directs or constrains the *Secretary* of a military department *only*, and, therefore, cannot be used to impede the COFC's jurisdiction by implication absent clear legislative intent. Further, plaintiff contends that without any direct and specific reference between 10 U.S.C. § 2405 and the CDA or the Tucker Act, said statute cannot restrict this court's fundamental jurisdiction on such vague language as is contained in § 2405 or on defendant's hospitable arguments to extend its application. This is so because established and relevant precedent directs that 10 U.S.C. § 2405 cannot be read to restrict this court's jurisdiction. Moreover, plaintiff contends that with respect to 10 U.S.C. § 2405, the contracting officer has no contractual right to reject BIW's claim based upon the 18–month rule, and to do so on this basis alone would, *ipso facto*, constitute a breach of contract.

Plaintiff's second contention is that regardless of any spending limitations placed upon the executive branch pursuant to 10 U.S.C. § 2405, or the existence of funds for said branch to settle disputes, BIW is contractually entitled to relief in the COFC and "to receive payment on its judgment from the Judgment Fund, as provided for at Section 13 of the CDA," in accordance with 31 U.S.C. § 1304. PO at 25–26. The Judgment Fund, argues plaintiff, does not address the functions of the agency, but rather it exists "to authorize courts to order payments *without being constricted* by concerns of adequate funds at the agency level to satisfy the judgment." PO at 26. Moreover, plaintiff avers that defendant's argument with respect to this provision would unreasonably imply the "absurd generalization that statutory limitations on the executive are concomitant limitations on the jurisdictional authority of the courts." PO at 27.

The third and final contention of plaintiff is that even assuming 10 U.S.C. § 2405 is a jurisdictional deterrent, BIW nevertheless submitted a timely claim pursuant to the statute. Specifically, plaintiff opines that "the 'events' giving rise to its claim would not occur until all the ECN changes under the old system were received and processed, and BIW could ascertain the scope of the change and reasonably estimate its impact." PO at 29. Accordingly, plaintiff argues that this "gestation" theory of "events," which is analogous with COFC precedent, would satisfy the 18–month time limitation given the proper certification of February 17, 1988. Plaintiff further avers that the February 17, 1988 certification is proper because 10 U.S.C. § 2405 requires only a section 6(c)(1) CDA certification, and is not governed by FAR § 33.207, which requires satisfaction of the two-part test. The result is, argues plaintiff, that CDA certification is satisfied by Vice President Graham's submission.

*Issues*

There is only one threshold issue[10] required to be decided by this court in the

---

**10.** Other issues addressed by the parties' submis-

sions but not dispositive of the subject motion

process of passing on defendant's subject motion to dismiss. That issue is—whether 10 U.S.C. § 2405, according to its plain language and its legislative history, is a fundamental bar on the COFC to the exercise of its jurisdiction or at least a statute of limitations restricting plaintiff's right to bring suit in this court when its broad letter requirements have not been satisfied.

*Discussion*

### 1. *Motion To Dismiss*

■ The essential contention proffered by defendant with respect to its motion to dismiss is, therefore, that the COFC lacks subject matter jurisdiction to entertain the claim because plaintiff failed to satisfy the threshold requirements of 10 U.S.C. § 2405, or, alternatively, that such omission constitutes a failure to state a claim upon which relief can be granted. When reviewing a defendant's motion to dismiss, pursuant to RUSCC 12(b), we normally consider the facts alleged in a plaintiff's complaint to be true and correct for purposes of the motion. *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988), *citing Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and *Air Prod. and Chems., Inc. v. Reichhold Chems., Inc.*, 755 F.2d 1559, 1562 n. 4, 225 USPQ 121, 123 n. 4 (Fed.Cir.), *cert. dismissed*, 473 U.S. 929, 106 S.Ct. 22, 87 L.Ed.2d 700 (1985). Factual allegations of non-movants, therefore, must be taken as true and all reasonable inferences drawn in favor of the party whose suit would be dismissed. *Id.* It must also be noted that if the motion to dismiss is for failure to state a claim, such motion must be denied "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102,

2 L.Ed.2d 80 (1957). If the motion to dismiss is for lack of jurisdiction, however, and it "challenges the truth of the jurisdictional facts alleged in the complaint, the ... court *may* consider relevant evidence in order to resolve the factual dispute." *Reynolds*, 846 F.2d at 747 (emphasis added and citations omitted).

■ With respect to ruling on such a motion, it is also a well-grounded proposition that the COFC is a court of special and, therefore, limited jurisdiction. *American Maritime Trans. Inc. v. United States*, 870 F.2d 1559, 1563 (Fed.Cir.1989). Accordingly, congressional consent to suit in this court, "thereby waiving the government's traditional immunity, must be explicit and strictly construed." *Puget Sound Power & Light Co. v. United States*, 23 Cl.Ct. 46, 56 (1991), *citing Library of Congress v. Shaw*, 478 U.S. 310, 318–19, 106 S.Ct. 2957, 2963–64, 92 L.Ed.2d 250 (1986).

The provision granting consent to suit in this court is, of course, the Tucker Act, 28 U.S.C. § 1491 (1988). Specifically, said statute provides that an action may be maintained in the COFC *only* if it is:

... founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, *or upon any express or implied contract* with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

28 U.S.C. § 1491 (1988) (emphasis added).

Therefore, it is undeniably clear that the party who files a complaint in this court must succinctly and unambiguously satisfy the jurisdictional requisites of the Tucker Act. The CDA is another relevant, jurisdiction-granting statute whose requirements must be satisfied in order to properly bring suit in this court.[11] Plaintiff at

---

are—whether 10 U.S.C. § 2405 prohibits the COFC from entering a judgment pursuant to section 13 of the CDA (otherwise known as the Judgment Fund); and whether plaintiff has satisfied the 18–month time limitation and the certification requirements of 10 U.S.C. § 2405(a) and (b), respectively. Because the court resolves the threshold issue against the defendant and finds that subject statute is an

impediment only against the Secretary of a military department, and not this court, it need not look any further into those collateral issues raised by the parties.

**11.** The requirements of the CDA are—(i) appropriate certification of the claim if it is for more than $50,000, and (ii) filing suit in this court within one year of the contracting officer's deci-

bar is attempting, of course, to satisfy the foregoing basic jurisdictional requirements through a contract claim—specifically, the contracts for construction of TICONDER-OGA Class Cruisers. The essential question is—whether plaintiff may properly fix the necessary jurisdiction in this court, pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act, 41 U.S.C. § 609(a)(1), when an executive agency has previously denied administrative (executive branch) relief pursuant to 10 U.S.C. § 2405.

2. *The Court of Federal Claims Is Not Jurisdictionally Barred by 10 U.S.C. § 2405 From Deciding The Merits*

a. *Jurisdictional Implications of 10 U.S.C. § 2405*

As previously noted, defendant has moved to dismiss plaintiff's contract complaints for an equitable adjustment for lack of subject matter jurisdiction based upon § 2405. Plaintiff's opposition response avers that—§ 2405 has no jurisdictional effects upon this court whatsoever, regardless of whether the Secretary of a military department properly determined that plaintiff has failed to meet the 18–month requirement as outlined in the statute. Specifically, § 2405 of Title 10, United States Code, provides that:

(a) *The Secretary of a military department may not adjust any price* under a shipbuilding contract entered into after December 7, 1983,[12] for an amount set forth in a claim, request for equitable adjustment, or demand for payment under the contract (or incurred due to the preparation, submission, or adjudication of any such claim, request for equitable adjustment, or demand) arising out of events occurring more than 18 months before the submission of the claim, request or demand.

(b) For the purposes of subsection (a), a claim, request, or demand shall be considered to have been submitted only when the contractor has provided the certification required by section 6(c)(1) of the Contract Disputes Act of 1978, 41 U.S.C. § 605(c)(1) (1978) and the supporting data for the claim, request, or demand.

10 U.S.C. § 2405 (emphasis added).

We begin our analysis by observing that, as a general rule, the CDA governs most suits in this court, which are based upon, as here, express contracts with the government. Specifically, the CDA contains a number of provisions which have been interpreted as jurisdictional prerequisites to the institution of suit in the COFC. For example, the requirement that a contractor submit an appropriate certified claim to the contracting officer[13] and the provision that explicates that a suit arising out of a contract subject to the CDA must be instituted within one year of the denial of plaintiff's claim by the contracting officer[14] have been determined to be jurisdictional.[15] At bar, plaintiff filed a claim for an equitable adjustment with the contracting officer who in turn denied same because he determined that plaintiff failed to satisfy the specific filing requirements set out in 10 U.S.C. § 2405. Thereafter, a timely appeal of the contracting officer's decision was filed in this court, pursuant to the CDA, to which defendant moved to dismiss for lack of subject matter jurisdiction in that there

sion. 41 U.S.C. §§ 605–609 (1978). Defendant does not contest the fact that—plaintiff met the certification requirements as of November 13, 1989, through Mr. D.D. Fitzgerald; that the contracting officer's decision was issued on July 20, 1990; and that the complaints were filed in this court on September 7, 1990.

**12.** The contracts at issue were entered into on December 27, 1983, and November 24, 1984.

**13.** 41 U.S.C. § 605(a) (1982). *See Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 184, 645 F.2d 966 (1981), *aff'd,* 230 Ct.Cl. 884 (1982).

**14.** 41 U.S.C. § 609(a)(3) (1982).

**15.** It should also be noted that not all contracts with the government are governed by the CDA. *See* 41 U.S.C. § 602(a) (1982). For example, suits based upon express contracts with the government that are not governed by the CDA are instituted in the COFC pursuant to the Tucker Act. *See Institut Pasteur v. United States,* 814 F.2d 624 (Fed.Cir.1987).

was allegedly a failure to comply with § 2405.

Only the statutes of limitations relative to the Tucker Act and in the CDA have been held to be jurisdictional prerequisites to the exercise of power in the COFC. The six-year statute of limitations (28 U.S.C. § 2501) with reference to the Tucker Act has been deemed jurisdictional and cannot be waived by the court on grounds of policy or equity. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957); *Jones v. United States*, 9 Cl.Ct. 292, 295 (1985). The CDA, like the Tucker Act, also contains a statute of limitations, *i.e.*, one year from the date of the contracting officer's decision, that the courts have also held to be jurisdictional. *Gunn–Williams v. United States*, 8 Cl.Ct. 531, 534 (1985).

There is a clear distinction, we believe, between those statutes and 10 U.S.C. § 2405 that dictates why they are jurisdictional and why § 2405 is not. As a general rule, the United States, as a sovereign entity, is "immune from suits save as it consents to be sued." *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), *citing United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Accordingly, a statutory time period for filing suit against the United States is an explicit "condition on the waiver of sovereign immunity and thus must be strictly construed." *Information Sys. & Networks Corp. v. United States*, 17 Cl.Ct. 527, 531 (1989), *citing Bowen v. City of New York*, 476 U.S. 467, 479, 106 S.Ct. 2022, 2029, 90 L.Ed.2d 462 (1986). Absent a *specific* statute of limitations, a suit in the COFC is controlled by 28 U.S.C. § 2501, which provides that:

> [e]very claim of which the United States Claims Court [now the U.S. Court of Federal Claims] *has jurisdiction shall be barred unless* the petition thereon is filed within six years after such claim first accrues.

(emphasis added). Rather than wording this statute as an express limitation on previously-granted authority, the Tucker Act presumes the lack of jurisdiction *until*

requirements of filing are met. In short, the jurisdictional nature of the statute is expressly stated therein and nothing is left for implication. *Farrell v. United States*, 9 Cl.Ct. 757, 758–59 (1986). The CDA is the act that creates the jurisdiction of this court to hear certain contract cases. The format of the statute is set up such that § 609 addresses judicial review of cases, § 609(a) specifically addresses court actions, and then § 609(a)(3) specifically grants the courts jurisdiction *if* the filing time requirement is met. *See* 41 U.S.C. § 609 (1978).

Both enactments are provisions that *grant* jurisdiction to the COFC. In neither case does the court have *any* jurisdiction but for the statute. Thus, where a statute is jurisdiction-granting, and it creates the arena or power for suit, it does not become a mere statute of limitations simply because it limits its own grant. Where a statute merely limits jurisdiction of a court that already existed but for that statute, that statute is merely a statute of limitations and is not jurisdictional. Therefore, the CDA and Tucker Act time limitations are unequivocally jurisdictional.

■ Conversely, it seems patently clear that here § 2405 simply addresses or directs an impediment *only at the Secretary* of a military department's time limitation with respect to which he may make adjustments to certain shipbuilding contracts, and *not* to suits against the United States in the COFC. Stated differently, although 10 U.S.C. § 2405 is clearly a statute of limitations at the administrative level against the Secretary, it is not an impediment to *de novo* jurisdiction in this court.

Finally, defendant cited *Do–Well Mach. Shop, Inc. v. United States*, 870 F.2d 637 (Fed.Cir.1989), in support of its contention that, even assuming that § 2405 is not jurisdictional, since the Court of Appeals for the Federal Circuit (CAFC) affirmed the dismissal for failure to meet a one-year *contractual* time bar, for failure to state a claim, *a fortiori*, a dismissal is appropriate in subject case where the mandated time frame is statutory. The problem we have with defendant's analogy is that we do not

agree that it is apposite at bar for the reason that there is no *contractual* time frame in this case, and, moreover, we do not read § 2405 as applying to anyone other than the Secretary for claims submitted for settlement, *i.e.,* "adjust[ment]." *Do-Well* is, therefore, clearly distinguishable.

b. *Statute of Limitations—Implications*

Section 2405 does not operate as a statute of limitations. Our reading of § 2405 does not lead us to the conclusion that it addresses any restraint on the courts, but rather, we believe a fair reading thereof compels the conclusion that it is a statute of limitations constraining only the "Secretary of a military department," *i.e.,* only at the administrative level. 10 U.S.C. § 2405.

■ Such finding that § 2405 is not a limitation upon this court stems from traditional means of statutory construction. In utilizing such approach, in all matters of statutory interpretation, we look first to— (i) the plain meaning of the statutory language, (ii) to other extrinsic aids such as legislative history, (iii) rules of statutory construction, and (iv) the construction placed on the statute by the agency which administers it, the ultimate objective being to discern, if possible, the intent of Congress. *Amgen, Inc. v. United States Intern'l Trade Comm'n,* 902 F.2d 1532 (Fed. Cir.1990), citing *Johns–Manville Corporation v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988). We will discuss each line of inquiry seriatim, except item # "iv." [16]

i. The Plain Meaning of 10 U.S.C. § 2405

The first inquiry the court makes in statutory construction is into the indications of the plain meaning of the statute. In construing statutes, the Supreme Court admonishes that we begin with the language of the statute and inquire whether Congress has clearly spoken on the subject; and if the intent of Congress is patently clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously-expressed intent of Congress. *Norfolk & W.R. Co. v. American Train Dispatchers,* —— U.S. ——, ——, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991), citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). That is to say, the plain meaning of a statute will prevail absent *very clear* legislative intent to the contrary. *Johns–Manville Corp.,* 855 F.2d 1556. In fact, courts will often give effect to the clear meaning of statutes, as written, without further inquiry. *Estate of Cowart v. Nicklos Drilling Co.,* —— U.S. ——, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992).

■ Before other methods of statutory construction are considered, the CAFC also starts first with the plain meaning of the statute, and then goes to other extrinsic aids, such as legislative history, *only if necessary. Richards Medical Co. v. United States,* 910 F.2d 828 (Fed.Cir.1990). Since it is true that the sole function of the courts is to enforce a statute according to its terms, where a statute's language is plain and its text is unambiguous, *i.e.,* the phrase has a clearly-accepted meaning in both legislative and judicial practice, it is not to be expanded or contracted by statements of individual legislators or committees during the course of the enactment process. *West Virginia Univ. Hosps., Inc. v. Casey,* —— U.S. ——, ——, 111 S.Ct. 1138, 1139–40, 113 L.Ed.2d 68 (1991). The plain meaning of the first clause of the statutory language in issue, *infra,* makes it clear beyond cavil that it is only the "Secretary [of the Navy]" and no other in this case who is constrained from adjusting BIW's contract price under certain circumstances. Title 10 U.S.C. § 2405 is crystal clear on its face in that regard, and it belies a license for an expansive reading to include this court. This we hold because the statute directs that *"the Secretary of a*

---

**16.** The court will not address agency interpretations of this statute because the agencies have ventilated no formal interpretive pronouncements into the *scope* of the statute. "Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493 (1988).

*military department may not adjust any price under a shipbuilding contract ... for an amount set forth in a claim ... arising out of events occurring more than eighteen months before the submission...."* 10 U.S.C. § 2405 (1984) (emphasis added). Nothing therein addresses the courts or any other person(s), natural or artificial; the language is an unambiguous directive specifically limiting to the Secretary; and it does not impact or modify either the CDA or the Tucker Act directly or by implication.

Since we conclude that § 2405 is unambiguous and that, facially, congressional intent is manifestly clear in restricting only the activity of the Secretaries of the military departments from *again* paying large stale claims, *infra,* we could end our analysis at this point and justifiably conclude that said act is not an impediment to the exercise of this court's de novo CDA jurisdiction. Solely on that basis, therefore, we are constrained to deny defendant's motion to dismiss. However, given the significance of this case, we will take the liberty to briefly explicate the other elements of statutory construction.

### ii. Legislative Intent

The second inquiry of the court, in seeking to understand the problem sought to be resolved, involves the legislative intent of Congress in passing § 2405. In construing statutes, the court considers *the statutory language itself to be the first source of legislative intent. Norfolk & W.R. Co.,* — U.S. at ——, 111 S.Ct. at 1163, *citing Chevron U.S.A., Inc.,* 467 U.S. at 842–43, 104 S.Ct. at 2781.

Legislative intent can also be surmised through legislative history, the reports of the houses of Congress, and from hearings before Congress. Legislative history of the statute suggests that Congress may have intended § 2405 to possess the requirements of a statute of limitations on plaintiff and prevent such military contractors from generally bringing stale claims. The more plausible reading of the legislative history, however, is that the statute was intended as a limitation only upon the Secretaries of the military agencies, and, therefore, the contracting officer as well. Such a reading is appropriate because the legislative history of the statute merely addresses *claim submission* regarding administrative "adjust[ments]," and not specifically the filing of a suit for adjudication outside the agency. If congressional intent sought to constrain the courts as well, the statute simply does not make that clear.

The legislative history of § 2405 began with discussions of shipbuilding contractor problems several years prior to the enactment of the statute. In 1977 the House of Representatives Committee on Appropriations held hearings on the problem of the massive buildup of shipbuilding claims. The claims were based on extra work beyond the contract requirements the contractors alleged the government caused them over a period of many years of performance of their contracts. H.R.Rep. No. 96–1317, 96th Cong., 2d Sess. (1980). Both the Navy and shipbuilders spoke at the hearings and indicated mutual interest in establishing procedures to settle changes expeditiously and equitably.

In 1978 the Navy settled over $2.7 billion in backlogged claims pursuant to shipbuilders' relief under P.L. 85–804, codified at 50 U.S.C. §§ 1431–1435, which authorized the Secretary of the Navy to award such extra contractual relief.[17] Congress permitted this massive claims settlement process to proceed so as to avoid years of protracted litigation. H.R.Rep. No. 96–1317, 96th Cong., 2d Sess. (1980). The decision to allow such settlement(s) was with the understanding that it was a *one-time settlement procedure* and that, thereafter, the Navy and its shipbuilders would be required to take the necessary steps to ensure that future contracts would be kept current so that no future situation would

---

**17.** Section 1431, Title 50 U.S.C., provides, in pertinent part, that:

The President may authorize any ... agency ... to enter into ... amendments or modifications of contracts heretofore ... made and to make advance payments thereon, without regard to other provisions of law ... whenever he deems that such action would facilitate the national defense....

develop where the Navy would be forced to pay off a large stockpile of claims years after the fact. *Id.*

In 1980, the Committee again became concerned at the prospect that massive claims were once more beginning to mount. The Committee determined that existing problems in shipbuilding indicated a potential for many additional future stale claims. The Committee also became concerned over a report issued by the General Accounting Office (GAO) in January 1980, concluding that the Navy faced a probable claim of $2.4 million from a single shipbuilder. *Id.* After discovering other potentially-large claims and an emerging likelihood of another large payout due to government errors in material specification and design details, the Committee readdressed the issue of large claims. The Committee was concerned that, in its effort to avoid claims, the Navy would enter into settlement agreements that would be disadvantageous to the government. *Id.*

Due to his extreme concern over statutes relating to shipbuilding procurement, Admiral H.G. Rickover testified and submitted a report on the situation faced in warship procurement and suggested legislation to cure the problem. Hearings Before a Subcommittee of the Committee on Appropriations, House of Representatives, 97th Congress, 1st Sess., part 1, 24, (1982). Among the recommended legislation, Admiral Rickover suggested the establishment of—

> a one year statute of limitations on submission of claims and prohibit payment of public funds for claims not fully documented and submitted within this period.

*Id.*

Admiral Rickover emphasized that the Navy paid out a considerable sum the last time claims piled up. He also indicated that there is a great potential, based on the contracts issued in the past years, that several more expensive claims would be made against the Navy, and he expressed fear that the Navy would *settle* these claims in such a way as would not be in the best interests of the government. It appears that the Admiral was expressing a fear of the Navy's conduct and requesting

that constraints be placed *on* the Navy. A restraint on the Navy's ability to pay out stale claims addresses the concerns behind the enactment of the statute without giving an overly-broad reading to a statute that appears facially clear. To read more into the plain language of the statute, which facially constrains only the *Secretary* of a military department, requires some legislative justification, and none exists. This interpretation enables the courts to assess the legal merits of all timely CDA claims; no stale claims would be paid to plaintiffs through administrative settlement violative of § 2405; and those plaintiffs with meritorious claims would properly obtain the judicial relief they deserve.

### iii. Rules of Statutory Construction

Because the legislative intent behind the enactment of § 2405 is not crystal clear, the court now undertakes to apply the traditional rules of construction to evaluate— whether the initial plain meaning interpretation of subject statute can withstand the scrutiny of such rules. It is a well-established rule of statutory construction that *clear* evidence of legislative intent prevails over *other* principles of statutory construction. *Johns–Manville v. United States,* 855 F.2d at 1559, *citing National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). That is to say, the court will look at and credit a statute's legislative history, *if* the statute is ambiguous, to see whether Congress clearly expressed an intent contrary to the plain language of the statute. *Alacare Home Health Servs., Inc. v. Sullivan,* 891 F.2d 850, 856 (11th Cir.1990). However, it is also a traditional rule of construction that the text of a statute, not the private intent of legislators, is law, and that legislative intent is a clue to the meaning of the text, rather than the text being a clue to the legislative intent. *Continental Can v. Chicago Truck Drivers, et al.,* 916 F.2d 1154, 1157 (7th Cir.1990). The foregoing general principles underscore the proposition that these rules, in substance, advocate emphasis on the plain meaning of a statute in determining whether Congress

has clearly spoken on the subject. In applying the same, we have found that the bold and operative language of § 2405 is unambiguous. *See, supra,* part i. To this extent, therefore, we are compelled to hold that Congress has spoken on the subject. By not mentioning the courts and refusing to modify the CDA, Congress has specifically chosen, by such action and inaction, to apply its limiting language *only on claims submitted* to the Secretary of a military department for settlement. Had Congress desired to enact a statute that clearly applied to the courts as well, such objective could have been easily accomplished by merely modifying the following clause:

> The Secretary of a military department may not adjust any price under a shipbuilding contract ...

to read—

> [Neither] the Secretary of a military department [nor any court] may adjust any price under a shipbuilding contract....

This simple task could have been accomplished by excising one (1) word (*i.e.,* "not") and incorporating therein four (4) new bracketed words. Against this background, the conclusion is inescapable that the courts were not within the contemplation of Congress when it sought to restrain agency Secretaries from *again* improvidently settling stale claims to the detriment of the United States. We believe that the meaning and purpose of this statute is unquestionably clear given the historical background. In determining the meaning of a statute, the court looks not only to the particular statutory language, but to the design of the statute as a whole and to its policy objective. *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990), *citing K mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). Here, we discern the legislative intent of § 2405 was derived, in part, from the congressional reports and hearings. *See, supra.* Given the totality of all of the circumstances, we can only deduce that the policy objective behind § 2405 was to as-

sure the *reduction* in government waste by agencies settling their stale claims to the detriment of the government. This policy, we believe, is pointedly met by the construction this court finds is manifest and within the plain meaning of the statute.

Finally, and most importantly, we note that it is also a well-established rule of construction that where a statute states what a term "means," then all other meanings not stated are excluded. *Johns–Manville,* 855 F.2d at 1559; *see Colautti v. Franklin,* 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684 n. 10, 58 L.Ed.2d 596 (1979). Combined with the plain meaning rule that courts may give effect to the clear meaning of statutes as written, *Estate of Cowart,* —— U.S. ——, 112 S.Ct. 2589, 120 L.Ed.2d 379, a rule can be stated that, where a statute states a term that in plain meaning defines a group to be bound, all those not ordinarily associated with that group are not bound by that statute. In other words, it is not permissible to construe a statute on the basis of a mere *surmise* as to what the legislature intended, and to assume that only by inadvertence it failed to state something other than what it plainly stated. *Doski v. M. Goldseker Co.,* 539 F.2d 1326, 1332 (4th Cir.1976), *citing United States v. Deluxe Cleaners & Laundry, Inc.,* 511 F.2d 926, 929 (4th Cir.1975).

*Conclusion*

Complaints were filed in this court appealing the contracting officer's decision(s) denying plaintiff's request(s) for adjustment(s) of two AEGIS Cruiser contracts. The contracting officer determined that plaintiff's claim(s) failed to satisfy the 18–month statute of limitations required to be met under 10 U.S.C. § 2405. After filing answers to plaintiff's complaints, defendant moved to dismiss for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim. For the reasons expressed hereinabove, we hereby deny defendant's motion to dismiss for lack of jurisdiction, because we hold that 10 U.S.C. § 2405 is not a jurisdictional bar to a CDA *de novo* review in this court.[18] We further

---

**18.** This court is mindful of *Peterson Builders, Inc. v. United States,* 26 Cl.Ct. 1227 (1992). To

the extent that said case did not address, as

hold that § 2405 does not operate as an 18-month statute of limitations, and, therefore, deny defendant's motion to dismiss for failure to state a claim.

The following Appendix G schedule shall now become effective:

1. All discovery in this case shall be completed by January 11, 1993.

2. The parties shall comply with paragraph 10 of Section V of Appendix G by January 25, 1993.

3. Plaintiff shall comply with paragraphs 11–13 of Section V of Appendix G on or before February 10, 1993.

4. Defendant shall comply with paragraphs 11–13 of Section V of Appendix G on or before March 5, 1993.

5. The parties are not required to file proposed findings of fact (paragraphs 11(a) and 11(b)).

6. The parties shall comply with paragraphs 14–15 of Section V of Appendix G on or before March 5, 1993.

As to paragraph 14 (Stipulations), the joint memorandum shall be in two parts:

a. The first part shall contain separately numbered paragraphs covering all matters to which the parties have stipulated during the course of the proceedings. The stipulations must be comprehensive and the fact that any matter may have been established during discovery by admission or otherwise is not grounds for omitting it from stipulation. A party may not refuse to stipulate as to the content or purport of a document simply by claiming that the document is the best evidence of its content. Nor is the fact

that a party deems a fact irrelevant a sufficient basis for refusing to stipulate to its existence. Relevance may be argued in the Memorandum of Contentions of Fact and Law.

b. The second part of the memorandum shall set forth any matters a party proposes to be stipulated, as to which the parties have failed to reach agreement, and which the proponent of the stipulation believes are not reasonably subject to dispute. Each such proposed stipulation shall be set forth in full, together with the reasons the proponent believes the matter is not subject to dispute. The opposing party must explain beneath why and to what extent it believes the matter to be in dispute.

7. If contemplated, the parties shall comply with paragraph 16 of Section V of Appendix G on or before March 5, 1993.

8. The pretrial conference shall be held at 10:00 a.m. on March 26, 1993, at the National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005. The exact courtroom location will be posted in the lobby. A trial date will be set at this conference.

IT IS SO ORDERED.

---

here, the basic jurisdictional issue, we respectfully disagree with the holding therein.