BATH IRON WORKS CORPORATION,
Plaintiff–Appellee,

v.

The UNITED STATES, Defendant–Appellant.

No. 93–5119.

United States Court of Appeals,
Federal Circuit.

March 11, 1994.

Robert H. Koehler, Patton, Boggs & Blow, Washington, DC, argued for plaintiff-appellee. With him on the brief was Michael J. Schaengold.

Shalom Brilliant, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Mary Mitchelson, Deputy Director. Also on the brief were David Agazarian, Ha-

rold A. Cohn, James Recasner and Samuel J. Galbo, Jr., Dept. of the Navy, of counsel.

Before RICH, MICHEL and LOURIE, Circuit Judges.

MICHEL, Circuit Judge.

The United States appeals from the November 12, 1992 order of the United States Court of Federal Claims (CFC), 27 Fed.Cl. 114 (1992),[1] denying its motion to dismiss Bath Iron Works Corporation's (BIW's) claims for price adjustments under two shipbuilding contracts either for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim upon which relief can be granted, because the claims were not submitted to the Contracting Officer (CO) within the 18–month time period of 10 U.S.C. § 2405 (1988). The CFC concluded that the time period of 10 U.S.C. § 2405 applied only to administrative proceedings before a Service Secretary. Consequently, the CFC held, the statute created no jurisdictional bar or statute of limitations to BIW's de novo suit under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1988). Because we construe 10 U.S.C. § 2405 as applying only to the Secretary of a military department and administrative proceedings conducted under the Secretary's authority, we hold that the statute creates neither a jurisdictional bar nor an affirmative defense to de novo adjudication of a CDA suit by the CFC. We therefore affirm.

## BACKGROUND

A full account of the facts is set out in the opinion of the CFC in *Bath Iron Works Corp. v. United States,* 27 Fed.Cl. 114. Only those facts necessary for our disposition are recited herein.

### A. The Dispute Between the Parties

BIW entered into a series of shipbuilding contracts with the Department of the Navy (Navy) in connection with the AEGIS Cruiser Program. The two contracts in dispute here, N00024–84–C–2005 (also known as the "CG 58 contract") and N00024–85–C–2036 (also known as the "CG 60 contract"), were awarded to BIW on December 27, 1983 and November 26, 1984, respectively.

These contracts were subject to a number of engineering change proposals (ECPs) during their performance. The procedure employed in administrating the contracts up until August 1986 provided that after issuance of each ECP, an agreed price would be negotiated for each design change to be followed by the issuance of an Engineering Change Notice (ECN). The ECNs contained revisions to drawings and other information necessary to implement each ECP. BIW alleged that in a number of instances, the ECNs and drawings indicated a scope of work greater than that set out in the corresponding ECPs, and thus performance of the ECPs involved additional work and costs to BIW in excess of the negotiated price. Therefore, BIW asserted that it was entitled to price adjustments in the two contracts.

BIW first submitted a Request for Equitable Adjustment (REA) on November 3, 1986, seeking "an *overall* · increase in contract prices for the Cruiser Program resulting from various actions and inactions by the Navy which affected BIW's performance." 27 Fed.Cl. at 118 (emphasis in original). Following negotiations with the Navy, BIW submitted a revised REA to the CO on May 18, 1987, which specifically identified the ECN issue, claiming increased costs of $4,166,000 for CG 58 and $1,167,000 for CG 60. *Id.* This revised REA did not include the certification required under the CDA, 41 U.S.C. § 605(c)(1), however. BIW submitted a second revised REA to the CO on February 17, 1988, claiming extra costs of $4,414,-634 for CG 58 and $1,182,358 for CG 60. *Id.* This second revised REA included the required certification language and was signed by William E. Graham, BIW's Vice President for Contracts. The government objected to this certification as defective under the statute because the vice president lacked the

---

1. The Court of Federal Claims certified the issue for interlocutory appeal in an order dated January 15, 1993. The government petitioned for permission to appeal, which was granted by order of this court on March 22, 1993. *Bath Iron Works Corp. v. United States,* 991 F.2d 811 (1993) (Table).

requisite authority to certify the claim. BIW then submitted a final revised claim on November 13, 1989, requesting costs of $4,052,-769 for CG 58 and $1,523,230 for CG 60. *Id.* at 119. The final revised claim was certified by D.D. Fitzgerald, the President and Chief Operating Officer of BIW.

### B. Contracting Officer's Decision

On July 20, 1990, the CO issued a final decision denying BIW's claim in its entirety. On the merits, the CO found that BIW had failed to demonstrate that the amounts of the claimed price adjustment arose from ECNs/drawings that extended the scope of work set out in the related ECPs, and that BIW actually incurred those amounts in performing the changes in question. Therefore, the CO concluded that BIW was not entitled to the requested price adjustments.

The CO also found that BIW's claims were time barred under 10 U.S.C. § 2405. Section 2405(a) provides in relevant part:

· The Secretary of a military department may not adjust any price under a shipbuilding contract entered into after December 7, 1983, for an amount set forth in a claim, request for equitable adjustment, or demand for payment under the contract ... arising out of events occurring more than 18 months before the submission of the claim, request, or demand.

Section 2405(b) further provides:

For the purposes of subsection (a), a claim, request, or demand shall be considered to have been submitted only when the contractor has provided the certification required by section 6(c)(1) of the Contract Disputes Act of 1978 (41 U.S.C. 605(c)(1)) and the supporting data for the claim, request, or demand.

10 U.S.C. § 2405. The CO found that BIW did not submit a properly certified claim satisfying the CDA requirements until November 13, 1989. Therefore, the CO determined that price adjustments for events occurring prior to May 14, 1988 were barred under section 2405.

Although "events" is nowhere defined in the statute, the CO determined that in this case "an event" for purposes of calculating the 18–month time limit was the receipt by BIW of the ECNs/drawings in excess of those used to price the corresponding ECP. Because all of the alleged excess ECNs/drawings supposedly responsible for the increased costs were received by BIW prior to May 14, 1988 (the date 18 months prior to BIW's duly submitted claims), the CO concluded that all recovery was barred as outside the statutory time period.

### C. Court of Federal Claims Action

On September 7, 1990, BIW brought suit in the CFC, asserting entitlement to the requested price adjustments under the Changes clause of both contracts and under the CDA. In lieu of an answer, the government filed a motion to dismiss for lack of subject matter jurisdiction, or in the alternative, for failure to state a claim upon which relief can be granted pursuant to Rule 12(b), Rules of the United States Court of Federal Claims (RUSCFC).

In its motion to dismiss, the government contended first, that satisfaction of the section 2405 18–month time period for submission of a claim to the CO was a jurisdictional prerequisite to maintaining a suit under the CDA, and second, that section 2405 created an 18–month statute of limitations for all shipbuilding contract claims based on contracts entered into after December 7, 1983. The government also contended that even if section 2405 has no jurisdictional effect, it creates an affirmative defense to the contractor's claims on the merits.

### 1. Jurisdictional Rulings

In arguing that the CFC lacked subject matter jurisdiction because the 18–month time period of section 2405 was not satisfied, the government relied on 41 U.S.C. § 609(a)(1), which requires submission of a properly certified claim to the CO as a prerequisite to CDA jurisdiction in the CFC. According to the government, if the 18–month time limitation is not met there is no "submission of a properly certified claim" to the CO because the CO has no power to act on the claim. Therefore, the government asserts that a claim which is late under sec-

tion 2405 violates the jurisdictional prerequisite of 41 U.S.C. § 609(a)(1).

▮ Rather than addressing the government's claim submission argument, the CFC chose to examine directly the 18–month limitation of section 2405 to determine whether it was jurisdictional in nature. The CFC noted that the CDA contains its own explicit statute of limitations, requiring contractor claims to be filed "within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim." 41 U.S.C. § 609(a)(3). Moreover, in the absence of a specific statutory provision, a suit in the CFC is limited by the general statute of limitations applicable to all cases in the CFC, which provides that, "[e]very claim of which the [Court of Federal Claims] has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Furthermore, the statutes of limitations in both the CDA and the CFC were here held to be jurisdictional prerequisites to the exercise of power by the CFC. 27 Fed.Cl. at 124 (citing *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957); *Jones v. United States*, 9 Cl.Ct. 292, 295 (1985); and *Gunn–Williams v. United States*, 8 Cl.Ct. 531, 534 (1985)). We have also so held in respect to 28 U.S.C. § 2501. *Hart v. United States*, 910 F.2d 815, 818–19 (Fed.Cir.1990) ("The statute of limitations is jurisdictional in nature and, as an express limitation of the waiver of sovereign immunity, may not be waived."); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988) ("The 6–year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immu-

nity and, as such, must be strictly construed.").[2]

The CFC then drew a clear distinction between those limitations in the CDA and the Tucker Act and the 18–month limitation of section 2405. The court explained that "[w]here a statute merely limits jurisdiction of a court that already existed but for that statute, that statute is merely a statute of limitations and is not jurisdictional." 27 Fed. Cl. at 124. Both the Tucker Act and the CDA are jurisdiction granting statutes, however, which further define the "arena or power for suit." *Id.* Therefore, the time limitations set forth in both statutes are unequivocally jurisdictional. *Id.*

By contrast, the CFC noted that section 2405 contains no reference to the court's jurisdiction, let alone a specific limitation on that jurisdiction. Section 2405 "simply addresses or directs an impediment *only at the Secretary* of a military department's time limitation with respect to which he may make adjustments to certain shipbuilding contracts, and *not* to suits against the United States in the [Court of Federal Claims]." *Id.* (emphasis in original). Therefore, the court concluded that section 2405, strictly construed, was "clearly a statute of limitations at the administrative level against the Secretary," and not "an impediment to *de novo* jurisdiction in [the] court." *Id.*

#### 2. Statute of Limitations

In addressing whether section 2405 nevertheless creates a statute of limitations for the contractor to bring a claim in court, the CFC considered the plain language of the statute, the legislative history and the rules of statutory construction.

---

**2.** The above cited cases expressly hold that the statutes of limitations in 28 U.S.C. § 2501 and 41 U.S.C. § 609(a) are jurisdictional. These holdings may seem to be called into question by the Supreme Court's holding, or at least its statement, in *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). The *Irwin* court, while acknowledging the previous holding in *Soriano v. United States*, 352 U.S. 270, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957), that the six year statute of limitations in 28 U.S.C. § 2501 was jurisdictional, nevertheless

held that "the rule of equitable tolling [is] applicable to suits against the Government, in the same way that it is applicable to private suits." *Irwin*, 498 U.S. at 95, 111 S.Ct. at 457. The language in *Irwin* that the time limit may be tollable can be reconciled with the cited holdings that these statutes of limitations are jurisdictional. Tolling is not the same as waiving. Presumably, therefore, *Irwin* merely holds that those time limits, while jurisdictional, can be equitably tolled in certain circumstances. In any event, we need not decide that issue here.

### a. Plain Language of Section 2405

The CFC observed that by its plain language, section 2405 simply addresses the "Secretary of a military department," placing a time limitation with respect to which "adjustments" may be made by "the Secretary" to certain shipbuilding contracts. Nowhere in the statute is the CFC mentioned. Furthermore, no reference is made in the statute to either the CDA or the Tucker Act, directly or by implication.

The CFC therefore concluded that the language of the statute was "unambiguous and that, facially, congressional intent is manifestly clear in restricting only the activity of the Secretaries of the military departments from *again* paying large stale claims." *Id.* at 126 (emphasis original). Therefore, the court concluded that by its clear and unambiguous terms, the statute posed no jurisdictional bar to its de novo CDA jurisdiction over BIW's claim. *Id.*

Although the court stated that this rationale was enough to defeat the statute of limitations argument, it proceeded with further analysis because it believed this to be an exceptionally important issue of statutory interpretation.

### b. Legislative History

The CFC determined that the legislative history of section 2405 further supported its conclusion that the 18–month time limitation applied only to the Secretary. The CFC traced the legislative origin of section 2405 to "discussions of shipbuilding contractor problems several years prior to the enactment of the statute." *Id.*

The CFC referenced numerous Appropriations Committee hearings discussing the one-time settlement of massive shipbuilding claims in 1978, and suggesting various means for preventing future buildups of claims. *Id.* at 126–27. In its discussion, the CFC noted that "[t]he Committee was concerned that, in its effort to avoid claims, the Navy would enter into settlement agreements that would be disadvantageous to the government." *Id.* at 127. These hearings culminated in the inclusion of a provision establishing an 18–month limitation for submission of claims to a

CO in the Fiscal Year (FY) 1984 DOD Appropriations Act, Pub.L. No. 98–212, Title VII, § 787, 97 Stat. 1453 (1983). The following year, section 2405 was enacted and codified in its present form in the DOD Authorization Act, 1985, Pub.L. No. 98–525, Title XII, § 1234(a), 98 Stat. 2604 (1984).

The CFC therefore concluded that section 2405 was directed to "the *reduction* in government waste by agencies settling their stale claims to the detriment of the government." *Id.* at 128 (emphasis in original). The CFC further stated:

> To read more into the plain language of the statute, which facially constrains only the *Secretary* of a military department, requires some legislative justification, and none exists. This interpretation enables the courts to assess the legal merits of all timely CDA claims; no stale claims would be paid to plaintiffs through administrative settlement violative of § 2405; and those plaintiffs with meritorious claims would properly obtain the judicial relief they deserve.

*Id.* at 127. Therefore, the CFC's analysis of the legislative history fully supports its earlier conclusion that section 2405 created no jurisdictional restriction on the courts and its conclusion that section 2405 did not impose a statute of limitations on the contractor.

### c. Statutory Construction

Finally, the CFC applied traditional rules of statutory construction "to evaluate— whether the initial plain meaning interpretation of subject statute can withstand the scrutiny of such rules." *Id.* The court recognized that it is a well established rule that "*clear* evidence of legislative intent prevails over *other* principles of statutory construction." *Id.* (citing *Johns–Manville v. United States*, 855 F.2d 1556, 1559 (Fed.Cir.1988) (emphasis in original)). It also noted, however, that "the statutory language itself [is] the first source of legislative intent." *Id.* at 126 (citing *Norfolk & W.R. Co.*, 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991)).

Applying these rules, the CFC concluded that "the bold and operative language of § 2405 is unambiguous." 27 Fed.Cl. at 128. The court stated that "[b]y not mentioning

the courts and refusing to modify the CDA, Congress has specifically chosen, by such action and inaction, to apply its limiting language *only on claims submitted* to the Secretary of a military department for settlement." *Id.* Finally, the court relied on the rule of construction that where a statute defines a certain group, then all other groups not specified are excluded, *see Johns–Manville*, 855 F.2d at 1559, to reinforce its conclusion that section 2405 applies only to claims made to the Secretary for an administrative adjustment, and not to those brought in the courts. 27 Fed.Cl. at 128.

### 3. Affirmative Defense

Lastly, the CFC addressed in passing the government's argument that even if section 2405 is not jurisdictional, that it provides an affirmative defense to BIW's claim. The government relied on *Do–Well Machine Shop, Inc. v. United States*, 870 F.2d 637 (Fed.Cir.1989), in which the Federal Circuit affirmed the CFC's dismissal of the case for failure to state a claim because the claim was not filed within the one year contractual time frame agreed to by the parties. Therefore, the government argued by analogy that, "*a fortiori*, a dismissal is appropriate in [the] subject case where the mandated time frame is statutory." 27 Fed.Cl. at 124.

The CFC concluded, however, that *Do–Well* was inapposite because it involved a contractual time limitation which necessarily barred any late-filed claims. The CFC concluded that the present case involved no contractual time limitation, but rather, a statutory time limitation which, as discussed earlier, applied only to an adjustment made by the Secretary. *Id.* at 125. The CFC therefore summarily dismissed the government's argument.

### ISSUES ON APPEAL

Whether 10 U.S.C. § 2405 acts as a jurisdictional bar or an affirmative defense which precludes the CFC from granting relief on claims brought under the CDA based on events occurring more than 18 months prior to submission to the CO.

### ANALYSIS

### I. Legislative Evolution of Section 2405

Prior to addressing the government's contentions on appeal, it is first necessary to understand the legislative history and purpose of 10 U.S.C. § 2405 in order to give context to our analysis. Therefore, we set out the following description and analysis of the statute's evolution.

### A. Events Leading to Codification of Section 2405

The legislative history of section 2405 can be traced back to hearings by the 1977 House of Representatives Committee on Appropriations discussing the problem of a massive buildup of shipbuilding claims. H.R.Rep. No. 1317, 96th Cong., 2d Sess. 258 (1980) (referencing the 1977 Committee hearings). "These claims were based on shipbuilder allegations that, over a period of many years, the Government caused the shipbuilders to perform substantial amounts of extra work over and above contract requirements and that this in turn entitled the shipbuilders to contract price adjustments in the amounts claimed." *Id.* Both shipbuilders and Navy officials testified at the hearings, indicating their mutual desire to establish procedures for expeditiously and equitably settling claims resulting from contract changes. *Id.*

The 1980 Committee Report on the Department of Defense (DOD) Appropriations Bill of 1981 took note of the 1978 mass settlement of $2.7 billion in backlogged shipbuilding claims pursuant to P.L. 85–804, which authorized "the Secretaries of military departments to make payments not otherwise authorized by contract when such action is deemed necessary to facilitate the national defense." *Id.* at 259. This settlement was authorized by Congress in order to avoid years of protracted litigation, with the understanding that this would be "a one-time settlement and that the Navy and its shipbuilders would take the necessary steps to ensure that future contracts would be kept current so that a situation would not again develop where the Navy was faced with large claims years after the fact." *Id.*

The Committee Report also recounted certain evidence, including a January 10, 1980 report from the General Accounting Office (GAO), which concluded that the Navy faced a probable claim from one shipbuilder for labor costs that were underestimated by 2.4 million hours, as well as certain steel and welding problems affecting many contracts which would have an undetermined future cost impact. *Id.* Additionally, the Committee heard witness testimony about a March 1980 Navy communique alerting the Secretary to mounting problems which strongly suggested the likelihood of future shipbuilder claims. *Id.* The Committee Report stated that:

> The slightest indication of having to again address the issue of large omnibus claims is of great concern to this Committee. More importantly, the Committee is concerned that the Navy, in an attempt to avoid any claims, may enter into agreements that may not be in the best interest of both the Navy and the taxpayer.

*Id.*

Later, in a hearing before the House DOD Subcommittee of the Committee on Appropriations, Admiral Hyman G. Rickover testified and submitted a report recommending that the government "establish a one-year statute of limitations on submission of claims and prohibit payment of public funds for claims not fully documented and submitted within this period." Hearings Before a Subcomm. on Appropriations, House of Representatives, 97th Cong., 1st Sess., pt. 3, at 24 (1981). This suggestion was intended to

> provide contractors ample time to identify and submit all legitimate claims, but foreclose the present practice of contractors waiting for several years to see how well they make out on a given contract and then submitting claims to make up for their overruns.

*Id.* Admiral Rickover separately observed that under the system at that time, shipbuilding contractors had every incentive to delay submission of claims, because "[w]hen claims are submitted years after the event, the knowledgeable people in Government frequently have left, leaving the Government at a disadvantage." Hearing before the Joint Economic Comm., 97th Cong., 2d Sess., pt. 1, at 39 (1982).

On January 27, 1983, the Comptroller General prepared a report on behalf of the GAO assessing Admiral Rickover's submitted report, "Recommendations to Improve Defense Procurement." Specifically, the Comptroller General emphasized the Admiral's testimony that the lack of a time limit on the submission of fully documented claims allowed shipbuilders to delay submission until years after the fact. Comptroller General Report, GAO/PLRD–83–37 at 47–48. The report summarized the Admiral's rationale for implementing a one year statute of limitations for claims submissions as follows:

> The Admiral stated that in an environment of threatened or actual work stoppage, poor relations with contractors, and pressure to pay the claims and move on with other Navy business, the Navy cannot hope to settle claims on merit. All of these factors, he said, work to the advantage of the shipbuilder with the inflated claim. Further, the Admiral stated that the Navy encourages the claims phenomena when it settles claims for more than they are worth just to end disputes. Admiral Rickover suggests that it often pays a contractor to submit a claim even if there is no case because the contractor will probably obtain a settlement to more than cover its expenses.

*Id.* at 48. After completing its own analysis, the Comptroller General concluded that "[t]he delay allowed for claims submission has undoubtedly been a major factor in the inability to settle claims and enactment of a time limit should help." *Id.* at 51. The report further reasoned that:

> Aside from obscuring the relevant issues, long delays in claims submissions often result in later delays in claims settlement. The inability to settle claims for long periods of time sometimes years, has led to such things as contractor financial problems, threatened and actual work stoppage, and hostile relations between Government and contractor. The situation deteriorated so greatly during the 1970s that all three major shipbuilders threat-

ened to stop work on Navy contracts entirely and one actually did so....

*Id.* at 51–52. Therefore, the Comptroller General recommended that "[t]he [Appropriations] Committee should obtain additional views on the appropriate time period and propose legislation which would—prohibit payment of public funds for claims not submitted, documented, and certified within a specified time...." *Id.* at 52.

In an October 20, 1983 Committee Report on the 1984 DOD Appropriations Bill, the Appropriations Committee addressed the Navy's past multi-billion dollar contract claim problem, acknowledging the recommendations of the GAO report along with the recommendations of its own Surveys and Investigations Staff. H.R.Rep. No. 427, 98th Cong., 1st Sess. 169–70 (1983). The Committee concluded that "an eighteen month time limitation for submission of contract claims by contractors is a fair time period" and recommended such a limitation be included in the 1984 Appropriations Bill. *Id.* at 170.

In its consideration of the 1984 DOD Appropriations Bill, the Senate Appropriations Committee stated:

The Committee recommends an 18–month limitation on the time *during which appropriated funds* can be used for the adjustment of contract prices. This recommendation is based on findings of a recent GAO report on proposed contracting reforms.

S.Rep. No. 292, 98th Cong., 1st Sess., at 196 (1983) (emphasis added).

Subsequently, the House–Senate conferees agreed that the following language be added to the FY 1984 DOD Appropriations Act:

Section 787. None of the *funds available to the Department of Defense* shall be used to adjust any contract price for amounts set forth in any shipbuilding claim, request for equitable adjustment, or demand for payment or incurred due to the preparation, submission, or adjudication of any such shipbuilding claim, request, or demand under a contract entered into after the date of enactment of this Act, arising out of events occurring more than eighteen months prior to the submission of such

shipbuilding claim, request, or demand. For the purposes of this Act, the requirement for "submission" of a shipbuilding claim, request, or demand is met only when the certification required in section 6(c)(1) of the Contracts Disputes Act of 1978 is provided and the shipbuilding claim, request, or demand is fully documented and substantiated in accordance with regulations to be promulgated by the Secretary of Defense.

Pub.L. No. 98–212, § 787, 97 Stat. 1421, 1453–54 (1983) (emphasis added). The following year, Congress included a similar 18–month provision in the Continuing Appropriations, 1985—Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 8078, 98 Stat. 1837, 1838–39 (1984).

In considering future appropriations legislation, the Senate Committee on Armed Services addressed the concern that section 787 of the FY 1984 DOD Appropriations Act amended the CDA. The Committee concluded that it did not, stating:

A second issue was raised with respect to a requirement at the end of section 787 that "the shipbuilding claim, request, or demand is fully documented and substantiated in accordance with regulations to be promulgated by the Secretary of Defense." *The concern was expressed that this phrase could be read to amend the Contract Disputes Act of 1978, Public Law 95– 563.* That law already requires that claims of more than $50,000 be accompanied by a contractor certification that the claim is made in good faith, that the supporting data are accurate and complete to the best knowledge and belief of the contractor, and that the amount requested accurately reflects the contract adjustment for which the contractor believes that the government is liable. (citation omitted). *In the committee's view, this provision of law is a requirement for certification and documentation. There is no need to change this provision, only to require the submission of the supporting data with the claim, which the committee amendment does....* The committee believes that a requirement for submission of supporting documentation is necessary for the government to be

in a position to resolve claims expeditiously and fairly, and therefore such a requirement has been incorporated. To date, the committee is not aware of any evidence that 18 months is not a sufficient time for contractors to assess the consequences of an event, assemble all pertinent documentation to support their claimed amount, and submit this documentation with their claim properly certified as provided in the Contract Disputes Act of 1978.

Department of Defense Authorization Act, 1985, S.Rep. No. 500, 98th Cong., 2d Sess. 257–58 (1984) (emphasis added). Although this passage does not directly address the 18–month provision, the clear implication is that there was no intention on the part of Congress to amend the CDA through this section.

The foregoing makes clear that the triggering event which motivated enactment of section 2405 was the Navy's one time payment of massive shipbuilding claims in 1978. Clearly, Congress intended through legislation to tie the hands of the military Secretaries in making administrative adjustments with their appropriated funds, so that the situation would not repeat itself.

### B. Enactment And Implementation of Section 2405

Section 2405, in its current form, was enacted and codified in Title 10, Armed Forces, Chapter 141—Miscellaneous Procurement Provisions, the following year in the DOD Authorization Act, 1985, Pub.L. No. 98–525, Title XII, § 1234(a), 98 Stat. 2604 (1984), amended Pub.L. No. 102–484, Title VIII, § 813(c), 106 Stat. 2453 (1992).

About eight months later, on July 25, 1985, the Secretary of Defense issued Defense Acquisition Circular 84–12, dated July 25, 1985, which added the following subparts to the DOD FAR supplement:

Part 33—Protests, Disputes, and Appeals

Subpart 33.2—Disputes and Appeals

33.210 Contracting Officer's Authority. Contracting officer authority under FAR 33.210 is limited by 43.70.

\* \* \* \* \* \*

Part 43—Contract Modifications

Subpart 43.70—Adjustments To Prices Under Shipbuilding Contracts

42.7001 Adjustments to Prices Under Shipbuilding Contracts. 10 U.S.C. 2405 provides that no adjustment in any price under a shipbuilding contract entered into after December 7, 1983 may be made for an amount set forth in a claim, request for equitable adjustment, or demand for payment under a contract (or incurred due to the preparation, submission, or adjudication of any such claim, request, or demand) arising out of events occurring more than 18 months before the submission of the claim, request, or demand.

The first proposed rules regarding implementation of section 2405, which merely tracked the statutory language, were published for comment by the Navy some four years later in the Navy Acquisition Procedures Supplement (NAPS), at 54 Fed.Reg. 47689 (Nov. 16, 1989). Later, the Navy published interim rules requiring, *inter alia*, that the CO include in all future shipbuilding contracts a contract clause implementing section 2405.[3] The following commentary was published along with those rules:

The Navy is keenly aware that the promulgation of a rule implementing 10 U.S.C. § 2405 involves questions of fairness that affect important interests of both the contractors and the government. Fairness requires that contractors have a full opportunity to recover on meritorious claims, requests or demands. If it were to turn out that there were instances where identification of an event, and assessment and documentation of the consequences of an event, were not possible in 18 months,

---

3. Specifically, NAPS 5252.243–9001(a) required inclusion in the contract of language advising the contractor that "[t]his contract is subject to 10 U.S.C. § 2405; therefore, no price adjustment will be made under this contract for an amount set forth in a claim ... arising out of events occurring more than 18 months before the submission of the claim, request, or demand." 56 Fed.Reg. 63664, 63675 (Dec. 5, 1991).

fairness would require that contractors be given an opportunity for recovery. By the same token, however, *contractors should not be free to develop claims long after-the-fact in attempts to get well under unprofitable contracts. This is the problem that resulted in the massive shipbuilding claims of the 1970's, and is the problem that Congress addressed in this legislation.*

To the extent that the statute and its legislative history are clear, the rule must adhere to the intentions expressed therein. Congress selected a period of 18 months as a reasonable time in which contractors could be expected to identify, quantify, document and submit claims and requests to the government. *The legislative history shows that Congress believed its action was essential for maximizing the resolution of claims by negotiated settlement rather than through costly, disputatious and time-consuming litigation.* This statute expressly applies to all shipbuilding contracts entered into by the military departments after December 7, 1983. *Congress determined that shipbuilding contracts should be treated differently in this regard than other contracts.* Congress' determination as to the need for such a limitation for shipbuilding contracts and the appropriateness of the 18–month period is not now subject to question by the Navy.

Interim Naval Acquisition Procedures Supplement, 56 Fed.Reg. 63664, 63665 (Dec. 5, 1991) (emphasis added).[4]

From the foregoing, it is also clear that the Navy itself considered section 2405 to be directed to the administrative settlement of actions under the Secretary's authority, and not to the litigation process. The Navy also recognized that section 2405 was intended to address the conflict of interest in settling claims contrary to the public interest, which resulted in the massive shipbuilding claims crisis and settlement in the 1970's.

## II. Government Arguments on Appeal

### A. Section 2405 as Limiting Court Jurisdiction

■ In several respects the government's contentions on the effect of section 2405 have changed from those it advanced in the CFC. On appeal, the government does not argue that BIW's suit in the CFC is subject to a statute of limitations in addition to the 12–month statute of limitations, measured from the CO's decision, that is set out in the CDA at 41 U.S.C. § 609(a)(3).[5] Thus, the government no longer asserts that section 2405 directly limits the jurisdiction of the CFC by somehow amending the CDA to add a second time limitation—18 months from the transaction to filing of the claim. Rather, the government now argues only that the CFC lacked subject matter jurisdiction over this case because BIW's claims could not satisfy another jurisdictional prerequisite of the CDA, namely, a final decision by the CO.

The CDA mandates that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). There is no dispute that that requirement was met here. But in addition to submission of a formal, written claim to the CO, a final decision[6] by the CO is also a jurisdictional prerequisite to maintaining a suit in the CFC. *Milmark Servs., Inc. v. United States,* 231 Ct.Cl. 954, 956, 1982 WL 25817 (1982) ("It is well established that without such a formal claim and final decision by the contracting officer, there

---

4. To date, final implementing rules for section 2405 have not been issued by the Navy.

5. Section 609(a)(3) provides in relevant part that "[a]ny action ... shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim...." 41 U.S.C. § 609(a)(3).

6. Under the CDA, the CO is required to issue a decision or notify the contractor of the time within which a decision will be issued within 60 days of receipt of a certified claim over $50,000. 41 U.S.C. § 605(c)(2). "Any failure by the contracting officer to issue a decision on a contract within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided [by the CDA]." 41 U.S.C. § 605(c)(5).

can be no appeal to this court under the CDA. It is a jurisdictional requirement.").

The CO found that BIW's claims failed to satisfy the time limitation for commencing an adjustment claim before a CO under 10 U.S.C. § 2405 because they were filed more than 18 months after the events from which they arose. Consequently, the CO as the agent of the Secretary of the Navy, deemed himself statutorily prohibited from granting the requested relief. He was correct. The government argues, however, that the jurisdictional prerequisite of a CO's *decision* was not satisfied because the "claim submitted to the [CO] as a prerequisite to suit under the CDA must be a claim that the CO possesses the statutory *power to grant* if he finds it meritorious." (Emphasis added.)

■ The government's argument is fundamentally flawed because it equates the CO's authority to render a final *decision* with the authority to grant relief. The fact that the CO was statutorily required to deny the untimely claim does not mean that the CO did not make a decision. It merely means he made a negative decision denying the claim. We note that the government cites no authority whatsoever supporting its assertion that in order to constitute a "decision" under the CDA, the CO must have the authority to *grant* a claim. Nor are we aware of any case authority that so holds. Certainly, nothing in the CDA or the FAR so provides, or even suggests. Nor has the government explained why such a requirement would implement the purpose of that CDA section. Therefore, we reject the government's argument that a claim's satisfaction of the 18–month time limitation for claim submission of section 2405 is a prerequisite to a "final decision" by the CO in order to satisfy the jurisdictional prerequisites of the CDA.

■ The government seeks to rely on *Sharman Co., Inc. v. United States*, 2 F.3d 1564 (Fed.Cir.1993). But *Sharman* is inapposite. In *Sharman*, we found the claim was effectively put in court litigation before the

CO issued a final decision. *Id.* at 1571. We therefore held that there was no "final decision" because the CO was divested of all authority to act in any way on the claim by 28 U.S.C. §§ 516–520 (1988), which gives the Department of Justice exclusive authority to act once a claim is put into litigation by the filing of a lawsuit based thereon. *Id.* at 1571–72. There is no analogous statutory provision in this case which divests the CO of authority to decide the claim merely because he may be statutorily required to deny it. As we discussed earlier, the fact that the CO may have been required by section 2405 to deny the claim does not mean he did not decide it.

■ As explained by the CFC in its opinion in this case, section 2405 is directed only to administrative adjustments by the Secretary of a military department, and by its plain language does not address, let alone restrict, the jurisdiction of courts. Nor does section 2405 contain any language that could arguably amend the jurisdictional provisions of the CDA, either explicitly or by necessary implication. We therefore conclude that 10 U.S.C. § 2405 creates neither an additional time limitation nor other jurisdictional prerequisite to a contractor suit in the CFC under the CDA.[7]

### B. Section 2405 as Changing Contract Rights

The government argues that even if section 2405, combined with CDA section 605, as construed in *Milmark,* is not jurisdictional, in conjunction with CDA section 609 it nevertheless creates an affirmative defense to BIW's claims or adds an unprovable element of entitlement.

### 1. Section 2405 is Simply Not Applicable to Courts

■ The government first notes the truism that because BIW's claims arose out of events occurring more than 18 months prior to their submission, the CO was statu-

---

7. We do not confront and do not decide whether section 2405 has any jurisdictional implications for the Armed Services Board of Contract Appeals. Perhaps a later case will present the question whether a statute directed explicitly to

the individual Service Secretaries and no one else nevertheless restricts the authority of this Defense Department Board to grant relief or hear an appeal at all.

torily prohibited from granting them. Therefore, the government argues, the CO correctly denied the claims, and consequently on review the CFC is required to affirm his decision, which could not be deemed erroneous. Second, the government asserts, BIW can show no entitlement to the price adjustment, and consequently the case should be dismissed for failure to state a claim upon which relief can be granted under Rule 12(b), RUSCFC.

■ The government argues that despite de novo litigation of the issues decided initially in the CO decision by the CFC in adjudicating a contractor's complaint,[8] 41 U.S.C. § 609(a)(3), the contractor is not entitled to relief unless the CFC finds that the CO's decision was incorrect, and no such finding is possible here. Because the CO lacked authority to grant the claim due to the statutory 18-month time limit, the government argues that BIW's contractual right to an equitable adjustment pursuant to the disputes clause cannot support a remedy, even in court, that was statutorily prohibited. This position is untenable for two reasons. First, the CFC suit is not a "review," but an original action, and the CFC does not "affirm" or "reverse" the CO, but simply decides entitlement *vel non* to the adjustment. It is acting as a trial court of first instance, not an appellate court. *Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed.Cir. 1987) (Under the CDA, "where an appeal is taken to a board or court, the contracting officer's award is not to be treated as if it were the unappealed determination of a lower tribunal which is owed special deference or acceptance on appeal.").

■ Second, once again the government confuses the restriction placed on the Secretary by section 2405 to make an "administrative adjustment" based on a shipbuilding claim filed with a military service and the authority of the CFC to adjudicate the merits of a contract lawsuit. As discussed *ante*, section 2405 creates no time-based prohibition to consideration of the merits of a com-

plaint by the CFC. To have done so, section 2405 would have had to amend CDA section 609. But it did not. Therefore, it is nonsensical to argue that the CFC is prevented by section 2405 from considering de novo a claim merely because it reflects the one earlier filed with the CO as it adjudicates the complaint before it. By its own terms, that section has no applicability whatsoever to proceedings in the CFC, the power of its judges or the rights of contractors under the CDA. In short, section 2405 simply does not apply to the CFC.

### 2. Section 2405 Does Not Change Substantive Contractual Rights

■ The government argues that the CO's denial in this case should be upheld because BIW has no contractual right to relief, since denial of its claim is required by statute. In other words, either the contractor shows compliance with section 2405 or he has not proven all elements of his prima facie case. The government compares this case with *Do–Well Machine Shop, Inc. v. United States*, 870 F.2d 637 (Fed.Cir.1989). In *Do–Well*, this court upheld the CO's rejection of a claim for costs due to termination for convenience because it was not submitted within one year of the termination as required by the terms of the contract. We held that failure to meet the time limit deprived the contractor of any contractual right of recovery. *Id.* at 640–41. The government argues that effectively upholding the CO's denial in this case by ruling against BIW on its complaint is even more appropriate than in *Do–Well*, since here the CO's denial was statutorily mandated as opposed to merely required by the terms of the contract.

■ In *Do–Well*, the contractor appealed from the ASBCA's grant of the government's motion for summary judgment, and the effective denial of the contractor's claim. *Id.* at 638–39. The issue presented in *Do–Well* was whether a contractual restriction was valid when even though consistent with the CDA,

---

**8.** The adjudicatory power accorded to the CFC by the CDA is de novo. 41 U.S.C. § 609(a)(3) ("Any action ... shall proceed de novo in accordance with the rules of the appropriate court.").

Therefore, the fact that the CO was statutorily required to deny a claim does not constrain the CFC from considering and deciding the merits of the complaint before it.

it was not required by the CDA. The contractual restriction was clearly applicable to the claim in that case.[9] Here, the statutory time limitation of section 2405 has no application to a case brought in the CFC. Rather, it applies only to the Secretary, limiting the time in which a shipbuilding claim can be *administratively adjusted* by him or his agents. Therefore, section 2405 no more extends to the substantive contractual rights of a party than to the adjudicatory powers of a court. Moreover, section 2405 is not directed to the rights of the parties under the contract but only the authority of the CO and the Secretary. Consequently, just as the court is free to review the merits of BIW's assertion of substantive contractual rights, those rights are unchanged by section 2405.

9. The *Do–Well* case was appealed to this court from a decision of a contract appeals board, the ASBCA. A Board, unlike a court, is established by the agency head. 41 U.S.C. § 607(a)(1). Thus, in certain situations the Boards may be under restrictions that the courts are not.

*Do–Well* involved an issue of applicability and interpretation of a contract provision. Once jurisdiction is established, both the Board and the CFC have complete and independent power to construe the meaning and applicability of contract provisions, irrespective of their relationship with the contracting agency. Therefore, the issue in *Do–Well* presents no question of differing restrictions between the Board and the court to grant relief, as might perhaps be the case where the issue involves applicability of a statute, here section 2405, which restricts the agency head but not the courts. *But see* 41 U.S.C. § 607(d) (1988 and 1992 Supp.) ("Each agency board shall have jurisdiction to decide any appeal from a decision of a contracting officer.... In exercising this jurisdiction, *the agency board is authorized to grant any relief that would be available to a litigant asserting a contract claim in the United States Court of Federal Claims.*") (emphasis added).

10. The government relies, for example, on an excerpt from a Report of the House Committee on Appropriations on the DOD Appropriations Bill for 1981, discussing the $2.7 billion one time settlement of backlogged shipbuilding claims in the late 1970's. H.R.Rep. No. 1317, 96th Cong., 2d Sess. 259 (1980). The government specifically relies on that portion of the Report which states that the settlement was allowed by Congress only because of an understanding that "the Navy and its shipbuilders would take the necessary steps to ensure that future contracts would be kept current so that a situation would not again develop where the Navy was faced with large claims years after the fact." *Id.*

### 3. Legislative Intent of Congress

#### (i)

 The government argues, nevertheless, that applying section 2405 to prevent the administrative resolution of shipbuilding claims filed with the CO after the 18–month period, while allowing such related claims to be adjudicated in a judicial forum, undermines the congressional intent in enacting section 2405, which, the government says, was to prevent payment of all stale shipbuilding claims, wherever brought. In support, the government cites portions of the legislative history in which, inter alia, one witness suggested a "statute of limitations" for claim submissions in order to prevent the buildup of stale claims.[10] According to the govern-

These statements do not establish, however, that Congress intended to limit the compensatory powers of the court. They merely speak to preventive measures to be taken administratively by the Navy.

The government also relies on statements made by Admiral Rickover in hearings before the House Subcommittee on Appropriations and the Joint Economic Committee in which he recommends that Congress "establish a one-year *statute of limitations* on submission of claims and prohibit payment of public funds for claims not fully documented and submitted within this period." Department of Defense Appropriations for 1982: Hearings Before a Subcomm. of the Comm. on Appropriations, House of Representatives, 97th Cong., 1st Sess., pt. 3, at 24 (1981); Economics of Defense Policy: Adm. H.G. Rickover: Hearing Before the Joint Economic Comm., 97th Cong., 2d Sess., pt. 1, at 39 (1982) (emphasis added).

We note that Admiral Rickover's request for a "statute of limitations" and a prohibition of payment of public funds may refer only to Navy action since he was then talking only about "submission of claims." In any event, a statute of limitations is plainly not what Congress enacted in section 2405. It merely tied the Secretary's hands, administratively, not the courts', adjudicatorily. Similarly, Congress did not prohibit payment of *all* public funds, only payment from defense appropriations.

Finally, the government relies on statements made in a Report by the House Committee on Appropriations, discussing findings of its Surveys and Investigations Staff and of the GAO, recommending a time limit for claim submissions. The Report noted GAO's analysis that "[t]he delay allowed for claims submission has undoubtedly been a major factor in the inability to settle claims and enactment of a time limit should help." H.R.Rep. No. 427, 98th Cong., 1st Sess. 170 (1983).

ment, the excerpts it cites establish that section 2405 was intended as a bar to untimely shipbuilding contract price adjustments, whether in an administrative or judicial forum. But nowhere do the excerpts mention courts. The government also argues that allowing free adjudication in the CFC would undermine the legislative purpose of the CDA to encourage administrative resolution of contract disputes. *See Paragon Energy Corp. v. United States,* 645 F.2d 966, 972–75, 227 Ct.Cl. 176 (1981), *aff'd,* 230 Ct.Cl. 884, 1982 WL 25259 (1982) (Contract Disputes Act was designed to implement the suggestions of the Commission on Government Procurement to reduce the complexity of dispute resolutions). But the CDA was passed years before section 2405. Nor does its legislative history suggest an intent to constrict judicial review in government contract cases. Indeed, the CDA expanded court powers, e.g., by making contract board decisions reviewable by our court, and by authorizing de novo consideration of claims in the CFC.

After reviewing the cited portions of legislative history in their entirety, we cannot agree with the government's broad and far-reaching inferences as to the ultimate legislative purpose behind enactment of section 2405. As we discussed in the preceding section outlining the historical development of section 2405, like its plain language, the statute's legislative history establishes that its restrictions apply to administrative adjustments to contract price by the Secretary of a military department, not to judicial determinations of contract entitlements by a court. Moreover, it is clear that the legislative purpose behind section 2405 was to eliminate the situation existing then in shipbuilding contracts by preventing the Navy from again settling massive accumulated, aging shipbuilding claims, possibly against the best interests of the taxpayers. There was concern that the Navy, eager to maintain the good will of its shipbuilders, would settle too high. The Navy was seen as having something akin to a conflict of interest. *See* H.R.Rep. No. 1317, 96th Cong., 2d Sess. (1980); Comptrol-

ler General Report, GAO/PLRD–83–37 (January 27, 1983). Any talk of staleness of claims, although staleness is certainly a problem, can only be considered incidental because the problem of old claims existed throughout the entire range of government contracting activity. It certainly extended to all defense procurements. Yet it was not for airplane or tank contracts that Congress added such a restriction, but only for shipbuilding contracts. It is clear that Congress specifically targeted only shipbuilding contractors with this legislation and that it was triggered by a specific event—the massive settlements of backlogged shipbuilding claims in 1977 by the U.S. Navy. Construing its ultimate purpose in enacting section 2405, thus we cannot agree with the government's extrapolations thereof.

(ii)

Moreover, section 2405 clearly was intended to limit only the use of funds appropriated to the Department of Defense in administrative settlements by a Service Secretary. Thus, the original enactment of the 18–month limitation on the Secretary settling shipbuilding claims first appeared in the FY 1984 DOD Appropriations Act, Pub.L. No. 98–212, § 787, 97 Stat. 1421, 1453 (1983), and later in the Defense portion of the Continuing Appropriations, 1985–Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 8078, 98 Stat. 1837, 1838–39 (1984), before finally being enacted in the FY 1985 DOD Authorization Act, Pub.L. No. 98–525, Title XII, § 1234(a), 98 Stat. 2604 (1984). Even then, it was not extended to other procurements or departments, much less the courts, which have separate authorization appropriations legislation. The entire legislative context of 10 U.S.C. § 2405 is directed only to price *adjustments* paid from appropriated Defense Department funds, not to a payments of awards after adjudication of claims in court. *See* 10 U.S.C. § 2405(a) ("The Secretary ... may not *adjust* any price....") (emphasis added).

---

Again, we note that all references appear to relate to submissions (to the CO) and to administrative settlement of claims, not to adjudication of claims by a court. Therefore, we conclude

that this reference does not support the assertion that section 2405 was intended to apply to the courts.

Moreover, section 2405 appears in Title 10 entitled "Armed Forces" in Chapter 141, designated "Miscellaneous Procurement Provisions." Additionally, the surrounding statutory provisions are directed only to defense acquisitions. *See* 10 U.S.C. § 2404 (entitled "Acquisition of petroleum: authority to waive contract procedures"); 10 U.S.C. § 2406 (entitled "Availability of cost and pricing records").

 By contrast, the authority of the courts to grant relief under the CDA is set out in Title 41, section 13, entitled "Public Contracts," which provides in pertinent part:

Any judgment against the United States on a claim under this chapter shall be paid promptly in accordance with the procedures provided by section 1304 of Title 31.

41 U.S.C. § 612(a). Section 1304 [11] appears in Title 31, entitled "Money and Finance" in Chapter 13—"Appropriations." It was first enacted in the Supplemental Appropriation Act of 1957, 84th Cong., 2d Sess., Ch. XII, Pub.L. No. 84–814, § 1302.[12] This provision was intended to establish a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds existed at the agency level to satisfy the judgment. *See Lopez v. A.C. & S., Inc.*, 858 F.2d 712, 716 (Fed.Cir.1988), *cert. denied*, 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989) (31 U.S.C. § 1304 provides a standing appropriation to pay court judgments and appeal board awards).

Section 2405 from Title 10 nowhere purports to amend these provisions of Titles 41 and 31. Indeed, where the legislative history

of section 2405 does explicitly reference Title 41, it expressly states that section 2405 was not intended to amend the CDA.[13] Furthermore, neither the relevant provisions of Title 41 nor Title 31 mention Title 10 with respect to the relevant restrictions of section 2405. Without some explicit indication of congressional intent, we decline to extend section 2405 beyond its plain meaning, which limits only payment of appropriated Defense Department funds for administrative adjustments by a Defense Department Service Secretary.

 Moreover, the purpose of the Act—essentially to minimize the quasi-conflict of the Navy Secretary—cannot apply to the CFC which plainly faces no such quasi-conflict.

The government argues, however, that where a statute is phrased as a restriction upon the use of appropriated funds, if the legislative history reveals a congressional intent specifically to restrict a right to payment rather than merely to restrict the use of particular funds, the legislative intent must be given effect, relying on *United States v. Dickerson*, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). The statute at issue in *Dickerson* provided that "no part of *any appropriation* contained in this *or any other Act* for the fiscal year ending June 30, 1939, shall be available for payment" of any enlistment allowance for "re-enlistments made during the fiscal year ending June 30, 1939, notwithstanding the applicable portions of ... [the basic military pay act]." *Id.* at 555, 60 S.Ct. at 1035 (quoting § 402 of Public Resolution No. 122, June 21, 1938, c. 554, 52 Stat. 809, 818–19) (emphasis added). The Court held that the statutory restriction

---

11. Section 1304 provides in relevant part:
 (a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law....
 31 U.S.C. § 1304(a).

12. Section 1302 appropriated such monies from the Treasury and postal revenues as were "necessary for the payment, not otherwise provid[ed] for, ... of judgments (not in excess of $100,000 in any one case) rendered by the district courts and the Court of Claims against the United States which have become final, together with such

interest and costs as may be specified in such judgments or otherwise authorized by law...." Pub.Law No. 84–814, § 1302, 70 Stat. 694 (1956).

13. Department of Defense Authorization Act, 1985, S.Rep. No. 500, 98th Cong., 2d Sess. 257–58 (1984) (cited *supra* on p. 1576) ("The concern was expressed that this phrase could be read to amend the Contract Disputes Act of 1978.... In the committee's view, this provision of law is a requirement for certification and documentation. There is no need to change this provision....").

upon use of appropriated War Department funds also suspended that right to receive allowances for those years from any source, based upon the clear legislative history of the statute. *Id.* at 561, 60 S.Ct. at 1038.

There is a fundamental difference between this case and *Dickerson.* In *Dickerson,* the legislative history expressly discloses that Congress intended the statute to suspend the substantive right to payment of re-enlistment allowances otherwise made available by statute because it expressly applied to *all* appropriations acts. There is no comparable expression in the legislative history of section 2405 of intent to affect substantive rights available under contracts or the CDA, or to apply to any appropriations act other than DOD's or to any official other than a Service Secretary and his subordinates. Accordingly, we decline to hold that the limitation of section 2405 on the Secretary's use of Defense appropriations in administrative adjustments extends to the payment of judgments to contractors after the courts have adjudicated their substantive rights.

Therefore, we cannot accept the government's characterization of the congressional intent behind section 2405 as affecting the rights of contractors or the powers of the court.

### 4. Prior Decisions

Finally, we note that the issue of the proper interpretation of the outer reaches of the restriction in section 2405 presents a case of first impression before this court. The government points out nonetheless that the CFC decision in this case is at odds with a prior decision of the CFC, *Peterson Builders, Inc. v. United States,* 26 Cl.Ct. 1227 (1992). But *Peterson* does not support the government. While not directly addressing much less deciding the issue, the *Peterson* court merely assumed that section 2405 could apply to provide a jurisdictional bar or other defense in a shipbuilder's suit in court. The holding of *Peterson,* however, was limited to interpretation of the term "events" as used in section 2405. Since the *Peterson* court concluded that further fact findings were necessary to determine whether the events giving rise to the claims actually occurred more

than 18 months prior to submission of the claims, it never decided the issue of whether section 2405 applied to claims brought in the CFC. 26 Cl.Ct. at 1229, 1232.

The government also cites a Board case, *Bath Iron Works Corporation,* ASBCA No. 43303, 93–2 BCA ¶ 25,792, 1993 WL 34541 (1993) (involving separate claims from those brought in this case), which holds that failure to submit a claim within the 18–month time limitation does not oust jurisdiction, but does raise an affirmative defense to the contractor's claim. In *Bath,* the Board relied on *Do–Well* to conclude that section 2405 provided an affirmative defense. It criticized distinguishing *Do–Well,* saying there was no authority for a "rule that only contractual affirmative defenses are enforceable in government contract disputes." Rather, the Board concluded that "[a] tribunal can enforce a noncontractual, statutory affirmative defense whose terms address only an agency's authority to entertain a claim," relying on *F.H. McGraw & Co. v. Milcor Steel Co.,* 149 F.2d 301, 303 (2d Cir.), *cert. denied,* 326 U.S. 753, 66 S.Ct. 92, 90 L.Ed. 452 (1945). The *McGraw* court did not enforce a Connecticut statute providing the affirmative defense of failure to file a claim within a 60–day statutory limit, not because it was noncontractual, but because it was repealed. *Id.* The Board unfortunately misses the basis of distinguishing *Do–Well,* just as it misconstrues *McGraw.* As we discussed previously, section 2405 does not create an affirmative defense not because it is statutory and not contractual. Rather, it creates no affirmative defense because it is applicable to neither contractual rights nor to the courts.

The CFC in the present case acknowledged the existence of the *Peterson* decision and respectfully disagreed with the holding to the extent that it may be read as impliedly addressing the applicability of the limitations of section 2405 to the CFC. 27 Fed.Cl. at 128–29 n. 18. Neither *Peterson* nor the Board opinion in *Bath* cited by the government is binding on this court. Moreover, based on our own analysis of the statutory language and history, we find the rationale of

those cases wholly unpersuasive as to the propositions for which the government cites them.

CONCLUSION

For the foregoing reasons, we conclude that 10 U.S.C. § 2405 creates no jurisdictional limitation, element of proof or affirmative defense to a contractor action under the CDA in the CFC. Therefore, the judgment of the Court of Federal Claims is

*AFFIRMED.*